In the Matter of FABRICATORS, INC., Debtor.

FABRICATORS, INC., Appellee, Cross–Appellant,

v.

TECHNICAL FABRICATORS, INC., Appellant, Cross–Appellee.

No. 90–1019.

United States Court of Appeals, Fifth Circuit.

March 27, 1991.

Irvin Grodsky, Grodsky & Mitchell, Mobile, Ala., for appellee cross-appellant.

Hugh D. Keating, Gulfport, Miss., Richard Scruggs, Pascagoula, Miss., for appellee cross-appellant.

Before THORNBERRY, JOHNSON and DAVIS, Circuit Judges.

JOHNSON, Circuit Judge:

Technical Fabricators, Inc. ("TFI") appeals a decision of the district court affirming the ruling of the bankruptcy court to equitably subordinate TFI's secured and administrative claims and to transfer TFI's liens to the estate of Fabricators, Inc. ("Fabricators") pursuant to 11 U.S.C. § 510(c). In a cross appeal, Fabricators, through its bankruptcy trustee, alleges error in the subordination of TFI's claims to a level equal to and not below that of general unsecured creditors. For the reasons set forth below, this Court affirms.

## I. FACTS AND PROCEDURAL HISTORY

TFI[1] and Fabricators both were corporations engaged in the steel fabrication business. TFI's sole stockholder, as well as its chief executive officer, president and director, was Marcus Wayne Williams ("Williams"). As of January 1985, Fabricators' stock was owned in equal percentages by four persons.[2] Prior to the events giving rise to this case, TFI and Fabricators had no business connection with each other.

In late 1984, Fabricators' president, James C. Avinger ("Avinger"), discussed with Williams the possibility of a merger, joint venture or outright sale of Fabricators to TFI because Fabricators was having difficulty with performing and completing its fabrication contracts. Fabricators' difficulties were due to a cash flow problem, inefficient management capability, and insufficient physical capacity and equipment in its two plants. Soon after the initial discussion, the stockholders of Fabricators and Williams began to negotiate in earnest. Fabricators' stockholders told Williams that the corporate accounting records had not been posted currently, but when posted the accounting records would show Fabricators with a positive net worth and a net profit from operations for the months of December 1984 and January 1985. The stockholders also advised Williams that Fabricators' current financial statements were not available because of computer problems.

Williams and Fabricators' stockholders executed a written stock exchange agreement on February 2, 1985, contemplating that TFI would obtain all of Fabricators' stock, while Fabricators' stockholders would receive twenty-five percent of TFI's stock. This agreement contained an escape clause allowing TFI to rescind prior to closing[3] unless TFI was satisfied with Fabricators' financial status. Incident to the stock exchange agreement, TFI agreed to loan Fabricators up to $500,000. On February 4, 1985, Fabricators executed a security agreement in order to secure any amounts TFI would loan to Fabricators, giving TFI a security interest in Fabricators' machinery, equipment, accounts receivable and contracts in progress. Thereafter, TFI made six advances to Fabricators totaling $369,000, as evidenced by certain promissory notes.[4]

After further discussion, the parties renegotiated the stock exchange agreement. In a signed agreement on February 10, 1985, Williams agreed to eliminate TFI's escape right and set a new closing date.[5] Contemporaneously, Williams was formally elected Executive Vice President of Fabricators. Beginning on February 13, 1985, the same employees managed the business affairs of TFI and Fabricators jointly and Fabricators' contracts were completed using TFI's plant.

Following Williams' takeover, Fabricators' poor financial condition continued and Williams was forced to confront Fabricators' problems. In compiling financial information to apply for an asset-based loan from an institutional lender, Williams learned of an ongoing tax audit targeted at Fabricators. Williams then discovered that the institutional lender would not furnish an asset-based loan to Fabricators. On March 7, 1985, Fabricators' auditors provid-

---

1. TFI was placed into an involuntary Chapter 7 proceeding on July 15, 1986. Subsequently, TFI converted the involuntary Chapter 7 proceeding to a Chapter 11 proceeding. The United States Bankruptcy Court for the Southern District of Alabama authorized TFI, as debtor-in-possession, to litigate this matter.

2. Fabricators' common stock was owned in equal shares by Theodore J. Millette, Thomas S. Millette, William G. Millette and James C. Avinger.

3. The closing date was set at 45 days after execution of the stock exchange agreement.

4. The advances were made as follows:

| Date | Amount |
|------|--------|
| February 4, 1985 | $40,000 |
| February 5, 1985 | $10,000 |
| February 10, 1985* | $44,000 |
| February 18, 1985 | $135,000 |
| February 22, 1985 | $40,000 |
| March 14, 1985 | $100,000 |

* The bankruptcy court found that the $44,000 advance was made "prior to February 10, 1985."

5. A new closing date was set at 45 days after execution of the new stock exchange agreement.

ed Williams with preliminary drafts of their audit reports which reflected a loss of $1,200,000 through November 1984 and a loss of $169,000 for the months of December 1984 and January 1985. These revelations resulted in a meeting on March 9, 1985, attended by Williams, Fabricators' former stockholders and one of Fabricators' auditors. At this March 9 meeting, Williams expressed his intention not to consummate the stock purchase. However, for the next two weeks, Williams continued to manage Fabricators' business while Fabricators continued to use TFI's facilities. Finally, on March 24, 1985, the parties signed a release agreement to cancel the stock exchange and provide for the repayment of the amounts already advanced by TFI. While Williams did not formally resign as an officer of Fabricators, Williams no longer exercised any significant management responsibilities.

Fabricators filed its petition for relief under Chapter 11 of the Bankruptcy Code on April 9, 1985. TFI filed three proofs of claim and a request for administrative expenses from Fabricators.[6] As debtor-in-possession, Fabricators filed an adversary proceeding requesting the bankruptcy court to equitably subordinate TFI's claims against Fabricators and to transfer TFI's liens upon Fabricators' property to the estate pursuant to 11 U.S.C. § 510(c).[7]

After hearing testimony, the bankruptcy court made specific findings concerning Williams' knowledge of Fabricators' financial status in February. Williams knew that: (1) Fabricators' credit lines were "jammed," (2) Fabricators' bank credit was exhausted, (3) Fabricators was unable to meet its payroll or payroll tax obligations and (4) Fabricators would be unable to timely perform its contracts in progress because of the inadequacy of Fabricators'

plants. The bankruptcy court emphasized the fact that Williams was not shown, and did not request, Fabricators' last federal income tax return. 109 B.R. 186. Fabricators' last income tax return, for the fiscal year ending November 30, 1983, reflected a loss of $612,000 and retained earnings of <$1,085,949>. The bankruptcy court found that TFI was an insider-fiduciary of Fabricators no later than February 2, 1985, when Williams assumed control and the two companies "effectively merged their affairs." Thus, the court undertook to rigorously scrutinize the dealings between TFI and Fabricators after that date, and found that TFI had engaged in the following inequitable conduct: (1) making loans to Fabricators on a secured basis at a time when Fabricators was undercapitalized and at a time when TFI's motivation in advancing the money was to acquire control of Fabricators in order to realize a projected $2,000,000 profit on contracts in progress; (2) causing creditors to extend new credit or to abstain from collection measures when TFI knew or should have known that Fabricators was in failing financial circumstances; (3) interfering with the completion of Fabricators' contract with Nicholson Engineering Systems to gain preferential payment and a release from TFI's liability to O'Neal Steel Corporation; (4) presenting a fraudulent resolution to open a new bank account, thus enabling Fabricators to deposit its receivables beyond the reach of a creditor; and (5) obtaining a lien upon Fabricators' assets to secure capital contributions, resulting in a shift of the risk of loss from TFI to the creditors of Fabricators.

Based on the inequitable conduct by TFI, the bankruptcy court subordinated TFI's secured claims and administrative claim to a position equal to and not below that of

---

**6.** These claims include the following: (1) a secured claim for $369,000 plus interest and costs, representing monies advanced by TFI to Fabricators during the period February 2, 1985, through March 12, 1985; (2) an unsecured claim for $150,000 to $200,000, representing monies allegedly owed by Fabricators to TFI for debts incurred by TFI to creditors of Fabricators for materials or services provided by the suppliers to Fabricators but billed to TFI (the bankruptcy court found that the evidence had

established the precise amount of this particular claim to be $160,450); (3) an unsecured claim for $750,000; and (4) an administrative expense claim in the amount of $406,566.38.

**7.** Fabricators' Chapter 11 proceeding was converted to a Chapter 7 proceeding on January 27, 1986, and H.S. Stanley, Jr. was appointed as trustee of Fabricators' estate.

general unsecured creditors pursuant to 11 U.S.C. § 510(c). The bankruptcy court also transferred TFI's liens to the estate as authorized by 11 U.S.C. § 510(c)(2). The district court affirmed the bankruptcy court's decision in all respects, concluding that there had been sufficient findings to justify the subordination of TFI's claims under the three-pronged test enunciated in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977). After the district court affirmed the bankruptcy court's order, TFI and Fabricators both timely appealed.

## II. DISCUSSION

### A. *Standard of Review*

 Findings of fact made in a bankruptcy proceeding will not be set aside unless clearly erroneous. *Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.)*, 712 F.2d 206, 209 (5th Cir.1983) (*"Missionary Baptist I"*). The clearly erroneous rule deserves strict application in this case where the district court has affirmed the bankruptcy court's findings. *Id.* Conclusions of law, on the other hand, are subject to plenary review on appeal. *Id.* Moreover, when a finding of fact is premised on an improper legal standard, that finding loses the insulation of the clearly erroneous rule. *Id.*

### B. *General Principles of Law*

 The bankruptcy court has long been recognized as a court of equity. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934).[8] Its equitable powers allow a bankruptcy court to produce fair and just results "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). The judicially-created doctrine of equitable subordination devel-

oped as a policy against fraud and the breach of the duties imposed on a fiduciary of the bankrupt. *See Id.*, 308 U.S. at 311, 60 S.Ct. at 247 (upholding use of equitable subordination as an equitable defense to the allowance of a claim in bankruptcy). This doctrine is now codified at 11 U.S.C. § 510(c), which provides that:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> > (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> >
> > (2) order that any lien securing such a subordinated claim be transferred to the estate.

The legislative history indicates that equitable subordination is to be invoked according to case law existing at the time of codification, with development of the concept being left to the courts. 124 Cong. Rec. 32398 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); 124 Cong.Rec. 33998 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini). Despite the laudable animus of the doctrine, this Court recognizes that equitable subordination is an unusual remedy which should be applied only in limited circumstances. *Holt v. Federal Deposit Insurance Corp. (In re CTS Truss, Inc.)*, 868 F.2d 146, 148–49 (5th Cir.1989). Moreover, the doctrine is remedial, not penal, and should be applied only to the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct. *Trone v. Smith (In re Westgate–California Corp.)*, 642 F.2d 1174, 1178 (9th Cir.1981); *Mobile Steel*, 563 F.2d at 701.

 This Court has enunciated a three-prong test for equitable subordination:[9] (1) the claimant must have engaged

---

**8.** At present, this notion is codified at 28 U.S.C. § 1481 (bankruptcy court is invested with the powers of a court of equity).

**9.** Satisfaction of the three-prong test does not mean that a court is *required* to equitably subor-

dinate a claim, but merely means that a court is *permitted* to take such action.

in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *Mobile Steel*, 563 F.2d at 700. In order to justify equitable subordination, the bankruptcy court is required to make specific findings and conclusions with respect to each of the requirements. *Missionary Baptist I*, 712 F.2d at 212.

■ The burden of proof in this case is clear. The initial burden of going forward with factual evidence to overcome the validity of TFI's verified proofs of claim rests on the trustee in this case. Once the trustee meets this initial burden, the burden then shifts to TFI to demonstrate its good faith and the fairness of its conduct. *See Mobile Steel*, 563 F.2d at 701.

## C. *Insider Status*

■ A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts. *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986); *see also Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.)*, 818 F.2d 1135, 1144 n. 8 (5th Cir.1987) (*"Missionary Baptist II"*). If the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary. *N & D Properties*, 799 F.2d at 731. Accordingly, whether a claimant is an insider of the debtor can be fundamentally important in an equitable subordination case in that it effects the standard of scrutiny a court will apply. TFI argues that *Missionary Baptist II* stands for the proposition that strict scrutiny is apposite only to fiduciaries. To the contrary, *Missionary Baptist II* merely states that a finding of inequitable conduct may be different, depending on whether the claimant is an insider or a fiduciary:

> The reason that transactions of insiders will be closely studied is because such parties usually have greater opportuni-

ties for such inequitable conduct, not because the relationship itself is somehow a ground for subordination. If the alter ego or insider has fiduciary responsibilities to other creditors, then claims that might otherwise be allowable as proved may perhaps be subordinated.

*Missionary Baptist II*, 818 F.2d at 1144 n. 8 (citations omitted).

■ The bankruptcy court found that TFI was an affiliate and insider of Fabricators no later than February 2, 1985, the date the parties signed the stock exchange agreement. TFI concedes that it was an insider for the period between February 10, 1985 (the date on which Williams was elected Executive Vice–President and the stock exchange agreement was revised to delete TFI's escape right), and March 24, 1985 (the date of the release agreement). However, TFI contends that it was not an insider either before February 10 or after March 24.

As for the period between February 2 and February 10, TFI argues that it could not have been an insider because the stock exchange was conditional on TFI's satisfaction with Fabricators' financial condition, and TFI did not acquire equitable or legal ownership of any of Fabricators' assets or stock.[10] In ruling that TFI was an insider of Fabricators within the definition provided in 11 U.S.C. § 101(30) during the period between February 2 and February 10, the bankruptcy court explained that TFI, through Williams, exercised control over Fabricators and the two companies constructively merged their affairs following the February 2 stock exchange agreement.

■ The district court placed emphasis on the aspect of *control* in finding that TFI was an insider of Fabricators. Indeed, the Bankruptcy Code and case law precedent stand for the proposition that control is a sufficient basis for insider status; a formal relationship, *e.g.* officer, director or shareholder, may be persuasive but is not a necessary factor. *See In re F & S Cent. Mfg. Corp.*, 53 B.R. 842, 848 (E.D.N.Y.

---

10. The period between February 2 and February 10 is important in that TFI advanced Fabricators a total of $94,000 and TFI received a security interest in Fabricators' assets.

1985).[11] Section 101(30) defines an insider to include:

(B) if the debtor is a corporation—
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;
(iv) partnership in which the debtor is a general partner;
(v) general partner of the debtor; or
(vi) relative of a general partner, director, officer, or person in control of the debtor.

Since a "person" includes a corporation, 11 U.S.C. § 101(35), TFI was an "insider" of Fabricators within Bankruptcy Code § 101 if TFI exercised control of Fabricators.

 A determination of insider status is a question of fact and therefore subject to the clearly erroneous standard of review. *Missionary Baptist I,* 712 F.2d at 210. In the instant case, the district court concluded that there was sufficient justification in the record to support a finding that TFI controlled Fabricators as of February 2, 1985. This finding is based substantially on the conduct of Williams, TFI's sole stockholder and chief executive officer. Williams himself admitted at one point during his testimony that he began to work long hours on Fabricators' business in early February. The evidence shows that after representing himself to creditors and other third parties as the chief executive officer and controlling interest holder of Fabricators, Williams negotiated the payment of Fabricators' debts and obtained new lines of credit. Also, Williams advised Fabricators' bookkeeper with respect to which debts to pay. A written note by Fabricators' accountant states that Williams "controlled his efforts from February 5, 1985, through March 9, 1985." Further, TFI's employees became Fabrica-

tors' employees while Fabricators used TFI's facilities to complete its contracts. Such evidence shows sufficient indicia of control to characterize TFI as an insider.

The term "affiliate" may apply to TFI as well. Section 101(2) defines the term "affiliate" to include:

(A) [an] entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor....

The legislative history indicates that the phrase "directly or indirectly" envisions "situations in which there is an opportunity to control, and where the existence of that opportunity operates as an indirect control." *Missionary Baptist I,* 712 F.2d at 210 (quoting S.Rep. No. 95–989, 95th Cong., 2d Sess., *reprinted in,* [1978] U.S.Code Cong. & Admin.News, pp. 5787, 5807). As we discussed earlier in this opinion, there was substantial evidence of control and that the affairs of TFI and Fabricators were managed jointly by TFI.

 After agreeing with the finding that TFI became an insider on February 2, this Court must next determine when TFI's status as an insider terminated. The bankruptcy court was not explicit in this respect. TFI argues that it could not have been an insider after the March 24 release agreement.[12] The trustee, on the other hand, contends that TFI remained an insider because Williams continued to represent himself as an officer of Fabricators after March 24. Without a clear factual finding by the bankruptcy court to support it, this Court is unable to accept the trustee's argument. Since TFI concedes that it was an insider until the release agreement was executed, this Court can endorse the use of rigorous scrutiny only for TFI's conduct until March 24.[13]

---

**11.** *See also Southern Pacific Co. v. Bogert,* 250 U.S. 483, 492, 39 S.Ct. 533, 537, 63 L.Ed. 1099 (1919) ("It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation.").

**12.** This date is important inasmuch as some of TFI's conduct which the bankruptcy court found to be inequitable occurred after March

24; namely, TFI's interference with the Nicholson contract. *See infra,* at pages 1468–70.

**13.** This resolution is supported by certain factual findings by the bankruptcy court which indicate TFI no longer controlled Fabricators as of March 24, 1985. First, the bankruptcy court stated that "Williams devoted his efforts and time toward the management and organization of Fabricators until March 24, 1985." Second, the bankruptcy court found that, "[u]pon execu-

■ Our inquiry does not end simply by finding an insider relationship. The cases are clear that the mere fact of an insider relationship is insufficient to warrant subordination, *Missionary Baptist I,* 712 F.2d at 210. The insider status goes only to establishing the standard to apply in reviewing the insider's conduct. In order to equitably subordinate a creditor's claim, the creditor-insider must actually use its power to control to its own advantage or to the other creditors' detriment. *See Comstock v. Group of Institutional Investors,* 335 U.S. 211, 229, 68 S.Ct. 1454, 1463, 92 L.Ed. 1911 (1948). With this in mind, we address next the issue of inequitable conduct.

## D. *Inequitable Conduct*

■ It is difficult to define the boundaries of inequitable conduct under the first part of the three-prong *Mobile Steel* test, but there have been recognized generally three categories of misconduct which may constitute inequitable conduct: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego. *Missionary Baptist I,* 712 F.2d at 212. This Court has made clear that the claimant's misconduct need not relate directly to the acquisition or assertion of its claim. *Mobile Steel,* 563 F.2d at 700.[14] In the instant case, the bankruptcy court evidently found that TFI had engaged in inequitable conduct within the first two categories.

### 1. Fraud, Illegality and Breach of Fiduciary Duty

Within the category of fraud, illegality and breach of fiduciary duty, the bankruptcy court found that TFI had acted inequit-

ably in four ways. We will discuss each of these in turn.

### a. *Inducing Other Creditors to Extend Credit*

■ The bankruptcy court found that TFI acted inequitably by causing other creditors to extend new credit to Fabricators and to abstain from collecting on past debts when TFI knew or should have known that Fabricators was in financial trouble. In the early part of February 1985, Greer and Sons, Inc., a creditor of Fabricators, was referred to Williams after inquiring about Fabricators' account. Once Williams assured Greer and Sons, Inc., that they would be paid, Greer and Sons, Inc., decided to continue an open account. Jeffreys Steel Company previously had declined to extend new credit to Fabricators, but Williams convinced the company to open a new line of credit after he represented himself as the chief executive officer and controlling shareholder of Fabricators. Subsequently, Jeffreys Steel Company advanced a total of $60,464.94. These findings are supported by evidence in the record and are therefore not erroneous. Moreover, in light of Williams' involvement in and access to Fabricators' financial affairs at the time of the misrepresentations of Fabricators' financial status to these creditors, this Court affirms the bankruptcy court's determination that such conduct was inequitable.

### b. *Obtaining Liens*

■ The bankruptcy court found that TFI acted inequitably by obtaining a lien on Fabricators' assets to secure its capital contributions. By shifting the risk of loss from TFI to the creditors of Fabricators,

---

tion of the Release Agreement [on March 24], Williams exercised no further management responsibilities as an officer of Fabricators, although no written resignation by Williams was ever signed."

**14.** In *Mobile Steel,* this Court quoted with approval the following passage:

The inequity which will entitle a bankruptcy court to regulate the distribution to a creditor, by subordination or other equitable means, need not therefore be specifically related to

the creditor's claim, either in its origin or in its acquisition, but it may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate.

563 F.2d at 700 (quoting *In re Kansas City Journal–Post Co.,* 144 F.2d 791, 803–04 (8th Cir. 1944)).

the bankruptcy court determined that TFI was unfairly advantaged by receiving a security interest in the assets. TFI argues that the fact TFI's advances were made on a secured basis has no bearing on whether TFI was guilty of inequitable conduct. In support of its contention, TFI points to a case in which the Tenth Circuit refused to subordinate a debt merely because the dominant shareholder had become a secured creditor of the corporation. *See In re Midtown Produce Terminal, Inc.,* 599 F.2d 389 (10th Cir.1979). If taking the security were the only basis for the finding of inequitable conduct in this case, we might be inclined to agree with the Tenth Circuit. However, obtaining the liens was not merely an isolated act, but was one step interconnected with a series of actions by TFI to gain an advantage over the position of other creditors.[15] Thus, the secured nature of TFI's advances was just one of the reasons for the bankruptcy court's decision, and this Court finds no reversible error here.

### c. *Opening a Checking Account*

▮ The bankruptcy court found that TFI acted inequitably by presenting a fraudulent corporate resolution to open a checking account in the name of Fabricators so that Fabricators could deposit its receivables beyond the reach of creditors. In mid-May 1985, Williams, misrepresenting himself as the chief executive officer of Fabricators, gave to the First National Bank of Mobile a corporate resolution purportedly authorizing the opening of an account on behalf of Fabricators. Williams admits that he knew the resolution was not authorized by Fabricators' board of directors. Although Fabricators already had an account at the Merchants and Marine Bank ("Merchants"), Fabricators was past due on monies it owed to Merchants. Accordingly, Williams acknowledged that the reason for opening the account was to es-

tablish a depository for contract proceeds beyond the reach of Merchants. Williams testified that he wanted to avoid the possibility of a setoff by Merchants. This Court finds no difficulty in affirming the bankruptcy court's determination that this was inequitable conduct.

TFI seeks to justify Williams' actions by arguing that the amounts deposited into the First National Bank account were used to pay off other creditors. While it could be sophistic to declare that an insider *per se* engages in inequitable conduct anytime one creditor is paid while another creditor is not,[16] Williams' contumely conduct here is atypical. In purposefully denying Merchants the right to any monies owed to them, Williams opened an account in another bank by the use of a fraudulent corporate resolution and the misrepresentation of himself as Fabricators' chief executive officer. Under these circumstances, the bankruptcy court did not err in determining that the opening of an account with First National Bank with fraudulent representations amounts to inequitable conduct.

### d. *Interfering with Nicholson Engineering Contract*

▮ In conjunction with the stock purchase agreement, TFI permitted Fabricators to use TFI's facility in Mobile, Alabama, to complete some of Fabricators' contracts. During the first week of April 1985, Fabricators had partially completed a contract of fabricated steel for Nicholson Engineering Systems (the "Nicholson contract") when TFI threatened to prevent shipment of the steel unless Fabricators agreed to pay the proceeds of the Nicholson contract to TFI. In turn, TFI wanted to use the proceeds to gain its release from certain trade debts owing to O'Neal Steel Corporation. The bankruptcy court found that TFI's threats precipitated Fabricators' Chapter 11 filing.

---

**15.** *See In re EMB Associates, Inc.,* 92 B.R. 9, 17 (Bkrtcy.D.R.I.1988) (finding insider committed egregious conduct by demanding liens on the debtor's property while allowing past and future creditors to continue investing money in the insolvent debtor).

**16.** In many cases, a failing business with limited financial resources has the onerous burden of preferring some creditors over others.

The bankruptcy court concluded that TFI's interference with the completion of the Nicholson contract to gain preferential payments and a release from TFI's liability with O'Neal Steel Corporation amounted to inequitable conduct. TFI claims that this conclusion is based on clearly erroneous findings of fact. TFI contends that the bankruptcy court's finding that the Nicholson contract precipitated Fabricators' Chapter 11 filing is clearly erroneous since Thomas Millette testified that the problem with the Nicholson contract merely played a role in the decision to file for protection. The district court recognized that there were conflicting versions of the Nicholson contract incident and that the bankruptcy court had to make a credibility determination. After reviewing the record, this Court agrees with the district court. While there may be evidence to support TFI's version, the issue here is not whether there is evidence to support a contrary result; rather, this Court must determine if the bankruptcy court's finding of fact was clearly erroneous. We find that it was not.

Another finding of fact contested by TFI is the bankruptcy court's description of TFI's action as an attempt to collect for itself the proceeds of the Nicholson contract. Since the record supports this finding, it is not clearly erroneous.

TFI next contends the bankruptcy court's determination that TFI's interference with the Nicholson contract amounted to inequitable conduct is based on an erroneous application of the law to the facts. Apparently, TFI's argument is that the bankruptcy court applied an incorrect standard of review. Since neither TFI or Williams exercised any further management responsibilities over Fabricators once the March 24 release agreement was signed, TFI was no longer an insider and the trustee was obligated to prove more egregious conduct. The bankruptcy

court's opinion is unclear as to the standard the court used in reviewing TFI's conduct in April. But whether the bankruptcy court reviewed TFI's actions regarding the Nicholson contract under the strict standard accorded insiders or the lesser standard requiring additional evidence of fraud or overreaching for non-insiders is not dispositive because TFI's conduct is inequitable under either standard. It is clear that TFI's ability to gain preferred payments from Fabricators by threatening to prevent the shipment of the steel for the Nicholson contract was made possible by the insider relationship previously existing between TFI and Fabricators. Fabricators' use of TFI's facility was a consequence of the stock exchange agreement and the "constructive merger" of their corporate affairs. As a result, TFI continued to be in an advantageous position to gain preferential payments that other creditors did not enjoy. Thus, the bankruptcy court did not err in finding that TFI committed inequitable conduct in respect to the Nicholson contract.

### 2. Undercapitalization

 The concept of undercapitalization normally refers to the insufficiency of the capital contributions made to a corporation.[17] When an insider makes a loan to an undercapitalized corporation, a court may recast the loans as contributions to capital. *See e.g., Spach v. Bryant,* 309 F.2d 886, 888 (5th Cir.1962). The ability to recharacterize a purported loan emanates from the bankruptcy court's power to ignore the form of a transaction and give effect to its substance. *See In re Global Western Development Corp.,* 759 F.2d 724, 727 (9th Cir.1985). While undercapitalization alone is an insufficient reason to use equitable subordination, evidence of other inequitable conduct may justify subordination. *Wood v. Richmond (In re Branding Iron Steak House),* 536 F.2d 299, 302 (9th Cir.1976).

---

**17.** The Supreme Court has explained the concept of undercapitalization in this manner: "where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder [will be treated] as a loan." *Pepper v. Litton,* 308 U.S. at 310, 60 S.Ct. at 246–47 (quoted in *Matter of Multiponics, Inc.,* 622 F.2d 709, 717 (5th Cir.1980)). *See In re Carolee's Combine, Inc.,* 3 B.R. 324, 327 (Bkrtcy. N.D.Ga.1980) (subordinating advances where the monies constituted virtually all of debtor's capital).

**1470**

██ The bankruptcy court stated that TFI's advances were more akin to a capital contribution since Fabricators was undercapitalized at the time the advances were made and TFI's principal motive in advancing the money was to acquire control of Fabricators in order to realize a projected $2,000,000 profit on Fabricators' contracts in progress. The bankruptcy court then ruled that TFI acted inequitably by making and securing these advances at a time when Fabricators was undercapitalized. On appeal, TFI concedes Fabricators was undercapitalized and, as a consequence, this Court must uphold the bankruptcy court's finding of undercapitalization. Moreover, it is clear that undercapitalization was not the sole reason for equitably subordinating TFI's claims in light of TFI's other inequitable conduct as described above.

In sum, the record supports the bankruptcy court's factual findings and its determination that TFI's acts amounted to inequitable conduct sufficient to justify equitable subordination.

### E. *Level of Subordination*

██ In its cross appeal, the trustee contends that TFI's conduct was so egregious that equity compels subordination below the status of general unsecured creditors. In making its decision, the bankruptcy court recognized TFI's efforts to rehabilitate Fabricators. The trustee argues that TFI should not be given priority over Fabricators' insiders who also attempted to revitalize Fabricators prior to bankruptcy. The general rule is that claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered as a result of the inequitable conduct. *Missionary Baptist II*, 818 F.2d at 1143.

The bankruptcy court's determination is supported by two factors. First, the bankruptcy court concluded that TFI's conduct resulted in injury where the validation of TFI's lien would result in little or no distribution to Fabricators' general creditors. In addition, the bankruptcy court considered the gravity of TFI's conduct, both in terms of its positive and negative effects on Fabricators. Together, the presence of these two factors supports a determination that subordination to the level of general unsecured creditors was appropriate under the circumstances.

### III. CONCLUSION

The bankruptcy court properly undertook the three-step analysis for equitable subordination under *Mobile Steel*. On appeal, the district court thoroughly considered the parties' claims and affirmed the bankruptcy court's decision. This Court is unable to find reversible error in the findings of fact or conclusions of law. As a result, this Court affirms the district court's judgment upholding the bankruptcy court's opinion.

AFFIRMED.