**In re VERMONT ELECTRIC GENER-ATION & TRANSMISSION COOP-ERATIVE, INC., Debtor.**

White Current Corp., Plaintiff,

v.

Rural Utility Service, U.S. Dept. of Agriculture, Defendant.

Bankruptcy No. 96–10335. Adversary No. 97–1005.

United States Bankruptcy Court, D. Vermont.

Oct. 15, 1999.

William J. Donahue, White River Junction, VT, for plaintiff.

Lloyd Randolph, Matthew J. Troy, J. Christopher Kohn, James G. Bruen, Jr., Civil Division, U.S. Dept. of Justice, Washington, DC, David W. Ogden, Charles R. Tetzlaff, Melissa A.D. Ranaldo, United States Attorney's Office, Burlington, VT, for defendant.

## *ISSUE*

### *RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

ROBERT L. KRECHEVSKY, Bankruptcy Judge.[1]

### I.

The matter before the court, a motion for summary judgment filed by the defendant, Rural Utility Service ("RUS")[2], an agency of the United States Department of Agriculture, draws into question a course of dealing over the past 22 years of RUS in assisting local cooperatives, such as the debtor, to produce and distribute electricity in rural communities. White Current Corp. ("WCC") raises the specific issue—equitable subordination—in a complaint it filed against RUS in the Chapter 7 case of Vermont Electric Generation and Trans-

---

**1.** Sitting by assignment of the Judicial Council of the Second Circuit.

**2.** The RUS was formerly known as the Rural Electrification Administration or "REA."

mission Corporation, Inc. ("the debtor"). WCC alleges, in the complaint filed on January 16, 1997, that the actions taken by RUS over a period of two decades are such that this court should subordinate the senior secured claims RUS holds on the debtor's property to WCC's junior claim on such property. *See* 11 U.S.C. § 510(c)(1).[3]

WCC has not filed a cross-motion for summary judgment but objects to the granting of RUS's motion contending either that there are genuine issues as to material facts or, if not, that RUS is not entitled to judgment as a matter of law. The parties have undertaken extensive discovery and have filed voluminous briefs. WCC has not submitted a separate, concise statement of the material facts as to which it contends that there exists a genuine issue to be tried, but instead has filed a statement either agreeing or disagreeing with the statement of RUS setting forth its proposed undisputed material facts.

## II.

### THE COMPLAINT

The complaint generally asserts that WCC, located in Vermont, is in the business of owning and operating hydroelectric generating facilities; that the debtor and Vermont Electric Cooperative, Inc. ("VEC"), on March 6, 1981, contracted with WCC to purchase electricity from WCC and that following the debtor's and VEC's repudiation of the contract, WCC, on November 17, 1994, received a final court judgment of $3,401,195, secured by a prejudgment attachment properly filed on April 8, 1987 against the debtor's property; that in 1983 and 1984, the debtor granted RUS various mortgages on the debtor's property to secure loans; that over the years, RUS exercised control over the debtor and VEC, as an "insider," in a "pattern of self-dealing," or with inade-

quate supervision, or in an "arbitrary" and "capricious" manner, such that under principles of equitable subordination, the court should subordinate the RUS senior mortgage liens to the junior judgment lien of WCC. The complaint alleges that the debtor's property is of substantially less value than the amount due on the RUS mortgages.

## III.

### MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Although WCC's papers filed in this proceeding are lengthy, containing multifarious propositions, the court finds that there is no meaningful dispute as to the following factual background. Congress established RUS under the Rural Electrification Act of 1936 ("REAct"), 7 U.S.C. §§ 901–950b, to provide financing, in the form of either direct loans or guarantees, to cooperatives formed to produce or distribute electricity at a reasonable cost to underserved rural communities. In this capacity, RUS provided financing to both VEC and the debtor.

WCC is a Vermont corporation engaged in the business of owning and operating hydroelectric generating facilities. WCC owns a hydroelectric plant downstream from one owned and operated by the debtor. In 1981, WCC entered into a contract with the debtor and VEC (together "the cooperatives"), under which the cooperatives agreed to purchase all of WCC's net electrical output. The cooperatives never purchased power under the contract and, on February 27, 1987, WCC filed a breach of contract suit in the Vermont state court. WCC recorded its writ of attachment against the debtor's facility on April 8, 1987. On November 17, 1994, WCC received a final judgment for $3,401,195

---

**3.** Section 510(c)(1), in pertinent part, provides:

　　... after notice and a hearing, the court may—(1) under principles of equitable sub-

ordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim....
11　U.S.C. § 510(c)(1).

jointly and severally against the cooperatives.

VEC is a non-profit rural electric distribution cooperative that sells electricity to its members. In 1977, RUS approved a $15,816,000 insured loan to VEC to finance its acquisition of percentage ownership interests in six nuclear generating facilities. RUS approved additional financing of $9,900,000 for the nuclear facilities in 1981. In 1980 and 1981, RUS approved loans of $500,000 and $13,406,000 to VEC for the construction of a hydroelectric generating plant.

RUS secured each of the loans and guarantees by liens on VEC's real and personal property. For each loan, the RUS Administrator certified that, in his judgment, the security was adequate and the loan was likely to be repaid within its specified term. The Vermont Public Service Board ("PSB")[4] approved each loan.

VEC caused the debtor to be incorporated in 1979 as a generation and transmission cooperative for the purpose of transferring to it VEC's generation assets and associated indebtedness. VEC did so for two overriding reasons. First, as a distribution (retail) cooperative, VEC's mortgage required it to produce revenues of at least 1.5 times the interest payable on its debt ("TIER" or "times interest earned ratio"). Because of the high interest costs associated with the generation assets (both the nuclear and hydroelectric facilities), VEC was unable to meet its TIER requirement. However, as a generation and transmission (wholesale) cooperative, the debtor was permitted to maintain a TIER of 1.0. The second reason for the formation of the debtor was to preserve VEC's tax-exempt status. Based on its members' anticipated usage, VEC had entered into contracts to purchase electricity. When members' demands fell short of expectations, VEC sold its excess output to non-members. These sales to non-members jeopardized VEC's tax-exempt status as a non-profit distribution cooperative. The debtor, which was organized as a generation and transmission cooperative, could sell to non-members without jeopardizing VEC's tax status.

In 1983, with RUS's approval, VEC transferred its generation assets to the debtor ("the transfer") and the debtor assumed the outstanding indebtedness of approximately $40,000,000 thereon. The debtor gave RUS mortgage and security interests in the transferred assets and in the all-requirements contract ("the ARC"), under which VEC agreed to purchase all of its power requirements from the debtor. Payments to the debtor from VEC under the ARC were expected to provide the primary source of funds for the debtor's repayment of its indebtedness to RUS. The PSB approved the formation of the debtor, the transfer of the generation assets, and the debt incurred by the debtor.

In September, 1983, RUS approved an additional loan guarantee commitment of $24,220,000 to the debtor to cover additional costs associated with the nuclear facilities ("the A8 loan"), after determining that termination of the debtor's interests in the nuclear facilities would have been several times more costly, and would have forced the debtor out of business. The amounts approved were allocated among the various nuclear facilities in which the debtor had acquired (or was in the process of acquiring through the transfer) an ownership interest.

The A8 loan was placed under special control and no funds were to be advanced without prior approval of the PSB. The PSB approved advances of $2,020,380 on July 12, 1984; $2,500,000 on November 30, 1984; $1,532,000 on May 16, 1985; and $1,367,480 on October 30, 1985. In April, 1984, one of the nuclear facilities to which the A8 loan commitment applied, Seabrook

---

4. The Vermont Public Service Board is a state entity charged with oversight of utility compa-

nies. *See* Vt.Stat. tit. 30, § 203 (1998).

2, was cancelled and its fuel, parts and common facilities were transferred to another such facility, Seabrook 1. Subsequently, in 1986, the debtor asked RUS to reclassify the A8 loan to permit funds originally intended for Seabrook 2 to be reallocated among the remaining nuclear facilities ("the reclassification"). The reclassification did not increase the amount of the total commitment under the A8 loan. No funds were advanced at that time, and PSB approval was not obtained.

In 1985, VEC defaulted on its payments to the debtor under the ARC and the debtor, in turn, defaulted on its loans made or guaranteed by RUS. The defaults continued while RUS and the debtor engaged in extensive negotiations in an attempt to restructure the debt. Twice during that time they reached an agreement, but, in both instances, the PSB rejected the resulting agreement.

31 U.S.C. § 3713 provides that the representative of an insolvent entity who pays such entity's other creditors before paying the amounts it owes to the United States becomes personally liable to the United States for the entity's debts.[5] In order to facilitate the restructuring negotiations, the Department of Justice ("the DOJ") issued assurances not to sue to the debtor to permit it to pay its day to day operating expenses and certain other debts as authorized by RUS., The DOJ issued no assurance not to sue with regard to any payment to WCC in connection with WCC's breach of contract suit.

On April 1, 1996, the debtor filed its Chapter 7 petition and VEC filed a Chapter 11 petition in this court. The amount of secured indebtedness owed by the debtor to RUS exceeds the value of the debtor's assets, and RUS's security interests were perfected before WCC obtained its lien on the debtor's property.

The organizational structure of VEC and the debtor was similar. An executive manager was responsible for the overall management of each cooperative's operations. The executive manager was selected by the cooperative's board of trustees which, in turn, was selected by its members. RUS was not a member of either cooperative, it did not have a seat on either board of trustees, and it did not dictate the selection of executive manager. Additional facts will be referenced as appropriate.

## IV.

### CONTENTIONS OF THE PARTIES

The gist of WCC's complaint is that, by approving the transfer, RUS enabled VEC to saddle the debtor with so much debt that it was unable to build sufficient equity to pay WCC's claim. WCC contends that VEC is an insider of the debtor and that the relationship of RUS to VEC and the debtor is such that RUS should be considered an insider of both cooperatives. WCC then argues that by creating the debtor and transferring to it the generation assets and the associated debt, VEC caused the debtor to be undercapitalized. Claiming that VEC's conduct should be imputed to RUS as an insider of VEC, WCC contends that RUS is an insider of the debtor responsible for its undercapitalization and that RUS's claims should be

---

5. 31 U.S.C. § 3713, Priority of Government Claims, provides, in relevant part:
 (a)(1) A claim of the United States Government shall be paid first when—
 (A) a person indebted to the Government is insolvent and—
 (i) the debtor without enough property to pay all debts makes a voluntary assignment of property;
 (ii) property of the debtor, if absent, is attached; or
 (iii) an act of bankruptcy is committed; or

(B) the estate of a deceased debtor, in the custody of the executor or administrator, is not enough to pay all debts of the debtor.
(2) This subsection does not apply to a case under title 11.
(b) A representative of a person or an estate (except a trustee acting under title 11) paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government.

subordinated. RUS denies that any control it may have had over the debtor as a result of its bargaining position or under its rights as a secured creditor gave it insider status or rendered its conduct inequitable.

WCC further contends that RUS had a duty to assist the debtor in attaining financial independence, which it breached by permitting the debtor to incur too much debt, by not exercising its right under the loan agreement to request removal of the debtor's executive manager and by not using all available means to obtain increases in the rates charged by VEC and the debtor. WCC claims that RUS failed to comply with statutory requirements by not certifying that, at the time of the transfer, the security for the loans to the debtor was adequate and that the loans would be repaid within the term of the agreement, and by not obtaining PSB approval for the reclassification. RUS denies there was a failure of compliance, and, even were certification and approval required, RUS owed no legal duty to WCC with respect thereto and WCC sustained no legal harm from the failure to obtain them.

WCC also claims that RUS's refusal to seek the DOJ's assurance not to sue prevented the debtor's representatives from paying WCC's claim. RUS argues that it had no obligation to waive liability for payment of claims ahead of its own, and that, where it did so, payment was for amounts the debtor authorized. The debtor did not authorize any payment to WCC in regard to its breach of contract claim. WCC and the debtor never entered into any settlement agreement and WCC's claim remained disputed until the state court rendered a final judgment in November, 1994.

## V.

### SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c), made applicable in bankruptcy proceedings by Fed. R.Bankr.P. 7056, provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court in deciding a summary judgment motion " 'cannot try issues of fact, but can only determine whether there are issues of fact to be tried.' " *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (*quoting Empire Electronics Co. v. United States,* 311 F.2d 175, 179 (2d Cir.1962)) (emphasis in original). Facts asserted in affidavits by the party opposing the motion are taken as true. *First Nat'l Bank of Cincinnati v. Pepper,* 454 F.2d 626, 629 (2d Cir.1972). The moving party has the burden of proving that no material facts are in dispute, and in considering such a motion, the court "must 'resolve all ambiguities and draw all reasonable inferences in favor' of the non-moving party...." *Mikinberg v. Baltic S.S. Co.,* 988 F.2d 327, 330 (2d Cir.1993) (*quoting Heyman v. Commerce and Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975)). A dispute concerning a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

With these principles in mind, and after a heedful review of the submitted materials, the court concludes that there is no genuine issue of material fact. For reasons hereinafter set forth, the court also concludes that WCC has not established the basis for equitable subordination and, accordingly, RUS is entitled to judgment as a matter of law.

## VI.

### THE DOCTRINE OF EQUITABLE SUBORDINATION

■ Because "RUS's security interest ... was perfected before WCC obtained

any lien on any [of the debtor's] property," (WCC's Response to Undisputed Facts at ¶ 31.), RUS's secured claims in the debtor's assets are, under Vermont law, superior in right to those of WCC, and the filing of a bankruptcy petition does not alter this result. *See Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136, 141 (1979) ("Unless some federal interest requires a different result, there is no reason why [security interests created by state law] should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

■■ WCC seeks to have the bankruptcy court reorder the otherwise applicable priorities of secured creditors by application of the principles of equitable subordination. Bankruptcy Code § 510(c)(1) permits the bankruptcy court "under principles of equitable subordination" to subordinate all or part of one claim to another. 11 U.S.C. § 510(C)(1). The legislative history indicates that Congress "intended that the term 'principles of equitable subordination' follow existing case law and leave to the courts the development of this principle." *Stop & Shop Cos., Inc. v. Rosow (In re Rosow),* 13 B.R. 203, 204 (Bankr.D.Conn.1981) (quoting 124 Cong.Rec. H11,095 (Sept. 28, 1978) S17,412 (Oct. 6, 1978)); *See also Midlantic Nat'l Bank North v. Borg–Warner Acceptance Corp. (In re Mayo),* 112 B.R. 607, 649 (Bankr.D.Vt.1990). "[E]quitable subordination is an unusual remedy which should be applied only in limited circumstances." *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.),* 926 F.2d 1458, 1464 (5th Cir.1991). In determining whether equitable subordination of a claim is justified, courts have generally applied the three-pronged *Mobile Steel* test, which requires (1) inequitable conduct by the creditor whose claim is to be subordinated (2) resulting in unfair advantage to the malefactor and/or harm to the debtor or its other creditors, and (3) that equitable subordination would not be inconsistent with oth-

er aspects of the Bankruptcy Code. *Benjamin v. Diamond (In re Mobile Steel),* 563 F.2d 692, 699–700 (5th Cir.1977); *See also United States v. Noland,* 517 U.S. 535, 538–39, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748, 754 (1996) (citing the *Mobile Steel* test as that generally followed); *Mayo,* 112 B.R. at 650. The court will consider the contentions of the parties as they relate to these criteria.

### A. Inequitable Conduct

■■ The extent and severity of misconduct necessary for equitable subordination, and the level of scrutiny applied depends on whether RUS is an "insider" of the debtor. "Insider status is not, by itself, sufficient to justify equitable subordination. However, it affords greater opportunity for wrongdoing, and it is the unconscionable use of such opportunity that may justify the use of equitable subordination. If a creditor is shown to be an insider of the debtor, its conduct is subject to a higher level of scrutiny, and the burden of proof is shifted, with the insider being required to prove its good faith and fair dealing." *Hoffman v. Astroline Co., Inc. (In re Astroline Communications Co., Ltd. Partnership),* 226 B.R. 324, 329 (Bankr.D.Conn.1998) (citations omitted).

■■ WCC does not contend that RUS held an equity interest in the debtor. WCC acknowledges that the debtor's executive manager was responsible for managing its operations; that the executive manager was appointed by the board of trustees, which was elected by the members of the cooperative; and that RUS did not have a seat on the debtor's board of trustees and had no power to elect or remove its members. WCC argues, however, that the dependence of the cooperatives upon RUS for financing gave RUS such pervasive control over their operations that RUS is an "insider" of both VEC and the debtor, that RUS therefore owes the cooperatives a fiduciary duty and

that its conduct should be subjected to special scrutiny.[6]

In support of its argument that RUS controlled the debtor, WCC cites the need for RUS's approval in order for VEC to transfer the generation assets and related debt to the debtor; RUS's agreement not to hold the debtor's directors personally liable for paying the claims of the debtor's other creditors[7]; RUS's powers under the mortgages to prescribe the accounting methods used, to audit the loans, to conduct its own analyses of the debtor's operations and to advise the debtor; and the fact that, in the absence of financing from RUS, the debtor would be unable to operate. WCC concludes that, "RUS, as a practical matter controlled VEC and [the debtor], because the cooperatives were dependent on RUS financing and RUS forbearance to stay afloat." (WCC's Mem. at 5.)

WCC relies on two decisions to support its argument that RUS exercised sufficient control over the debtor to be considered an insider. However, neither decision is apposite to the present proceeding. *In re Wabash Valley Power Ass'n, Inc.*, 77 B.R. 991 (Bankr.S.D.Ind.1987), concerned the valuation of a generation and transmission cooperative's assets. Although WCC quotes the court as saying that, "[RUS] exercises 'pervasive' control" over the debtor cooperative, that statement was not a conclusion of the court, but merely quoted testimony presented to it. *Wabash*, 77 B.R. at 994 (citing transcript of the hearing). *Salt River Project Agric. Improvement & Power Dist. v. Federal Power Comm'n*, 391 F.2d 470 (D.C.Cir.1968), *cert. denied, Arkansas Val G & T, Inc. v. Federal Power Comm'n*, 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968), held that electric cooperatives were not public utilities subject to regulation by the Federal Power Commission. While noting that RUS's lending authority gave it the power to oversee various aspects of a borrowing electric cooperative's operations, the court in *Salt River* did not interpret such rights as indicia of an equity interest. It specifically noted that: "[The cooperatives] are completely owned and controlled by their consumer-members, and only consumers can become members. They are non-profit. Each member has a single vote in the affairs of the cooperative, and service is essentially limited to members." *Salt River*, 391 F.2d at 473. Rather than bolstering WCC's argument that the debtor's failure to develop equity was due to inequitable conduct of RUS, *Salt River* indicates that cooperatives like the debtor were not intended to build equity. *Id.* at 473, n. 6 ("Most of [the cooperatives] have developed a 'capital credits' plan by which all money over and above that required for operating costs is credited back to the member-owners who paid it in. Consequently neither the cooperative nor any individual can profit from the sale of electricity by the cooperative to its members.")

The United States Court of Appeals for the Second Circuit has ruled that a creditor's control of a debtor through exercise of its rights under a loan agreement or its leverage as a result of the debtor's need for financing does not warrant equitable subordination of its claim. *Cosoff v. Rodman (In re W.T Grant Co.)*, 699 F.2d 599 (2d Cir.1983). The Second Circuit did not

6. RUS argues that, as a governmental unit, RUS was not a "person," ("... 'person' includes individual, partnership, and corporation, but does not include governmental unit ...", 11 U.S.C. § 101(41)), and, therefore, cannot be considered an "insider" ("insider" includes ... person in control of the debtor....§ 101(31)(B)(iii)). However, this argument does not preclude the possible consideration of RUS as an "insider." Although § 101(31)(B) defines "insider" to "include" a

"person in control of the debtor," § 102(3) provides that the word "includes" is not intended to be limiting. The plain language of the Code, therefore, does not necessarily exclude consideration of a governmental unit as an insider of a debtor, if such entity is shown to have been in control of the debtor.

7. *See supra* note 5.

construe a bank's influence on the debtor's operations as indicative of insider status, and held that a creditor's senior position must be taken into account. "We entirely agree ... that a creditor is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim. The permissible parameters of a creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy [Code]; apart from these there is generally no objection to a creditor's using his bargaining position, including his ability to refuse to make further loans needed by the debtor, to improve the status of his existing claims." *W.T. Grant*, 699 F.2d at 609.

■ The court concludes that RUS did not become an insider of the debtor by reason of its bargaining position or the powers granted it under the loan documents. Because RUS was not an insider of the debtor, WCC's argument that RUS's providing of secured financing to an undercapitalized debtor constitutes inequitable conduct lack merit. Undercapitalization alone does not satisfy the inequitable conduct prong of the *Mobile Steel* test. *See, e.g., Fabricators, Inc.*, 926 F.2d at 1469 (requiring evidence of inequitable conduct in addition to undercapitalization by insider secured creditor).

■ "Where the claimant is a non-insider, egregious conduct must be proven with particularity." *Anaconda–Ericsson v. Hessen (In re Teltronics )*, 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983) "[T]he standard of inequitable conduct that justifies subordination of a non-insider/non-fiduciary's claim can be summarized in the following manner: unless the creditor has dominat-

ed or controlled the debtor to gain an unfair advantage, his claim will be subordinated, based upon inequitable conduct, only if the claimant has committed some breach of an existing, legally recognized duty...." *80 Nassau Assoc. v. Crossland Fed.Sav. Bank (In re 80 Nassau Assoc.)*, 169 B.R. 832, 840 (Bankr.S.D.N.Y.1994).

WCC argues that under the REAct, RUS had "a statutory duty to oversee all of its borrowers, but it failed in this dismally with respect to [the debtor]." (WCC's Mem. at 5.) WCC contends that such a duty arose under § 930 of the REAct, entitled "Congressional declaration of policy." This provision provides that it is the "policy of the Congress that adequate funds should be made available to rural electric ... systems through direct, insured and guaranteed loans ... and that such rural electric ... systems should be encouraged to develop their resources and ability to achieve the financial strength needed to enable them to satisfy their credit needs from their own financial organizations and other sources at reasonable rates and terms consistent with the loan applicant's ability to pay and achievement of this chapter's objectives." 7 U.S.C. § 930. WCC does not cite, nor has the court located, any support for this contention in the language of the statute, the case law or the legislative history.

Under the REAct, RUS may not grant loans without (1) approval by the PSB and (2) certification by the administrator of RUS that, in his judgment, there is reasonably adequate security for the loan and that the loan will be repaid within the time agreed.[8] WCC acknowledges that when each loan was initially approved, these requirements were satisfied. However, RUS

---

8. 7 U.S.C. § 904 provides, in relevant part:
 ... Such loans shall be on such terms and conditions relating to the expenditure of the moneys loaned and the security therefor as the Secretary shall determine and may be made payable in whole or in part out of the income, except that no loan for the construction, operation, or enlargement of any

generating plant shall be made unless the consent of the State authority having jurisdiction in the premises is first obtained. Loans under this section shall not be made unless the Secretary finds and certifies that in his judgment the security therefor is reasonably adequate and such loan will be repaid within the time agreed.

did not, at the time of the transfer in 1983 and 1984, recertify that the security for the indebtedness "transferred" from VEC to the debtor remained adequate, and PSB approval was neither sought nor obtained when the A8 loan was reclassified in 1986. RUS argues that these events did not involve the issuance of new loans and did not, therefore, require the recertification and reapproval. WCC argues that RUS's conduct was illegal, breached its legally recognized duties to the debtor and its creditors, and thus constitutes the kind of "inequitable conduct" required for equitable subordination.

Without considering whether the REAct requires such recertification by RUS or reapproval by PSB, RUS's conduct violated no legal rights either of the debtor, which voluntarily sought and accepted the loan proceeds, or of its other creditors. *See Alabama Power Co. v. Ickes*, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), and *Duke Power Co. v. Greenwood County*, 302 U.S. 485, 58 S.Ct. 306, 82 L.Ed. 381 (1938) (holding that the granting of loans by a federal administrator to a power company, even if granted in disregard of the applicable statute or regulations, violated no legal rights and inflicted no legal harm on competing power companies); *See also Rural Electrification Administration v. Northern States Power Co.*, 373 F.2d 686, 696 (8th Cir.1967) (applying *Alabama Power* holding to loans granted under the REAct). Because RUS violated no legal rights of the debtor or its creditors, the granting, transferring and reclassification of the loans was not inequitable conduct.

WCC argues that RUS, by waiving liability and permitting payment to all of the debtor's other creditors, but refusing to do so with respect to RUS's claim, engaged in inequitable conduct. The court finds this argument flawed because RUS was under no obligation to waive liability to permit payment of WCC's claim. Because it had no such legal obligation to WCC, its refusal to waive liability did not constitute inequitable conduct. RUS waived liability with regard to (1) payment of day to day operating expenses and (2) payments pursuant to settlement agreements reached with other claimants. Inasmuch as WCC's claim was in neither category, it was not unfairly treated.

WCC's argument that RUS's conduct resulted in a "taking" without just compensation is unsupported. WCC was not deprived of any interest in property as a result of RUS's actions.

**B. Harm/Unfair Advantage**

 In this Circuit, the second requirement for equitable subordination involves a conjunctive test, a showing of both unfair advantage to one creditor and harm to the debtor or its other creditors. *Mayo*, 112 B.R. at 651 ("We hold that the test should be in the conjunctive because of the 'no harm, no foul' rule. For one creditor to have achieved an unfair advantage there must have been a benefit. It must then be shown that such unfair advantage hurt the debtor or its creditors."); *also see W.T. Grant*, 699 F.2d at 611 ("They must show at least that the banks acted solely for their own benefit, taking into account their [senior position] ... *and* adversely to the interest of others.") (emphasis added). WCC has not shown that RUS's approvals of the loans or the transfer conferred any unfair advantage on RUS. None of RUS's actions improved its position as a secured creditor. RUS never took an additional security interest without a corresponding increase in indebtedness. Although the transfer shifted both assets and liabilities from VEC to the debtor, WCC does not allege that the transfer improved RUS's position. WCC has not sustained its burden of proof to show that RUS's conduct conferred an unfair advantage on RUS or how RUS's conduct harmed the debtor or its other creditors. The transfer did not harm WCC's position, because RUS had perfected its security interests before WCC acquired its lien on any of the debtor's property. The doctrine of equitable subordination is "remedial, not penal, and should be applied only to

the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct." *Fabricators, Inc.*, 926 F.2d at 1464.

### C. Consistency with Bankruptcy Code

WCC argues that, in enacting the REAct, Congress intended RUS to subsidize rural electrical cooperatives at the expense of the public, not at the expense of their junior creditors. This argument is meritless. The statute requires that each loan approval be supported by a certification that there is adequate security therefor. 7 U.S.C. § 904. WCC's plea for junior creditors, if adopted, would require the categorical subordination of any claim where RUS was the senior lienholder, independent of the individual equities involved. The U.S. Supreme Court has rejected blanket application of the doctrine of equitable subordination to subordinate classes of claims as a matter of policy. *United States v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (bankruptcy courts may not equitably subordinate IRS tax penalty claims as a matter of policy), holding that "the circumstances that prompt a court to order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Bankruptcy Code." *Id.*

■ The Bankruptcy Code generally does not imbue creditors with greater rights under a bankruptcy proceeding than they would enjoy under the otherwise applicable non-bankruptcy law, unless it is to serve some bankruptcy purpose. *Butner,* 440 U.S. at 55, 99 S.Ct. 914. Equitable subordination of RUS's claim under the circumstances here presented would, in effect, confer greater rights upon WCC than those to which it would be entitled in a non-bankruptcy setting. Such a conclusion would be inconsistent with the policies of both the Bankruptcy Code and the REAct.

Whatever the imprudence of RUS's activities as alleged by WCC, WCC could not maintain a suit against RUS directly, because it lacks standing to do so. *See REA v. Northern States Power Co.*, 373 F.2d at 696 ("[W]e find that Congress did not intend to create any legally enforceable rights for the private power supplier" under the REAct). Because WCC could not have prevented the RUS loan from being granted, or forced RUS to oversee the debtor's operations, or maintained an action for damages against RUS in a non-bankruptcy context, and there is no recognized bankruptcy purpose to be served by elevation of WCC's claim, equitable subordination of RUS's claim in favor of WCC clearly is not warranted.

### VII.

### *CONCLUSION*

In light of the foregoing discussion, the court concludes that there are no genuine issues as to any material fact and that RUS is entitled to judgment as a matter of law. The motion of RUS for summary judgment therefore must be, and hereby is, granted and a judgment will enter dismissing this action. It is

SO ORDERED.