In re COLONIAL POULTRY
FARMS, Debtor.

CENTRAL COOPERATIVES,
INC., Plaintiff,

v.

Mary W. IRWIN, Defendant.

Adv. No. 94–4085–2.

Bankruptcy No. 93–40651–2.

United States Bankruptcy Court,
W.D. Missouri.

Jan. 17, 1995.

Ronald S. Weiss, Samuel S. Ory, Berman, DeLeve, Kuchan & Chapman, Kansas City, MO, for plaintiff.

James E. Thompson, Jr., Crouch, Spangler & Douglas, Harrisonville, MO, for defendant.

David C. Stover, Trustee, Kansas City, MO.

## ORDER DENYING COMPLAINT TO RE-CHARACTERIZE OR EQUITABLY SUBORDINATE THE CLAIM OF MARY W. IRWIN

FRANK W. KOGER, Chief Judge.

This matter is before the Court on the complaint filed by Central Cooperatives, Inc. (Central) requesting that the Court recharacterize or in the alternative equitably subordinate the unsecured nonpriority claim filed by Mary W. Irwin, a/k/a Mary L. Irwin. A hearing was held on October 18, 1994, at which three witnesses testified and the Court admitted 34 items into evidence, including three corporate minute books of Colonial Poultry Farms, Inc. The Court has read the briefs filed by the parties, has independently researched the issues, and is now ready to rule.

### FACTS

To begin this tale, we must journey back to the year 1940 when a group of industrious individuals founded Colonial Poultry Farms, Inc. (Colonial) a Delaware corporation formed for the purpose of operating general poultry farms and hatcheries; hatching, raising, and selling baby chicks and all kinds of poultry; breeding purebred poultry; and doing such other acts as incidental to a general poultry and hatching business, including borrowing money and executing promissory notes, mortgages, and liens. The Certificate of Incorporation provided that Colonial would commence business with capital in the amount of $1000. Colonial had authority to issue 5000 shares of common stock at a par value of $100 per share for a total of $500,000. The by-laws authorized Colonial to have an office in Pleasant Hill, Missouri, and such other places as Colonial required.

At the meeting of incorporators held January 2, 1940, the following individuals were elected as directors of Colonial: Eden C. Booth, Robert A. Padgett, J. Alton Riffle, and Ralph F. Terrall. The board of directors held their first meeting on January 6, 1940, in Pleasant Hill, Missouri. The directors elected officers and passed numerous resolutions, including resolutions to capitalize the company by accepting offers made to Colo-

nial to exchange property for stock in the corporation. The initial capitalization of Colonial consisted of a poultry farm in Shenandoah, Iowa valued at $60,400 offered by Padgett in exchange for 604 shares of stock; a poultry farm in Florence, Colorado valued at $64,000 offered by Booth in exchange for 640 shares of stock; and a poultry farm in Cullman, Alabama valued at $25,600 offered by Terrall in exchange for 256 shares of stock. The initial capitalization well exceeded the $1000 capital requirement of the Certificate of Incorporation. The board further resolved to accept the offer made by Booth to lease a poultry farm in Pleasant Hill, Missouri to Colonial for five years with an option to sell the property to Colonial on the same stock basis as the foregoing transactions.

Colonial was a success for many decades. As the years passed, Colonial expanded its operations and at one time had hatcheries in at least ten states and had at least two breeding facilities. Colonial was world famous for its company bred True–Lines "Mini," a small layer known for its consistently high production of marketable eggs. Colonial became an industry leader in supplying chicks to the farm flock or back-yard producer, and also supplied chicks and parent stock internationally to governments overseas and in Mexico, and to universities throughout the United States including the University of Missouri. Colonial also filled almost 100% of the orders for chicks placed by Sears, Roebuck & Company, which in turn resold the chicks to Sears' customers.

In 1944, the stockholders approved a recommendation made by the board of directors to change the number of shares of common stock that Colonial was authorized to issue to 50,000 shares at a par value of $10 per share for a total of $500,000. In 1945, the stockholders approved a resolution made by the board of directors to increase the number of shares of common stock to 100,000 shares at a par value of $10 per share for a total of $1,000,000. At one time, Colonial had at least 48 shareholders and had issued over 48,000 shares of stock.

M. Richard Irwin, a/k/a M.R. Irwin, first appears as a shareholder of record in the minutes of the annual meeting of stockholders held on October 13, 1947. At the 1947 annual stockholders meeting, the shareholders elected M.R. Irwin to a position on the eight-member board of directors. The minutes of the board of directors meeting held October 13, 1947, reflect that M.R. Irwin was appointed to serve on two committees and worked as Colonial's general field manager.

M.R. Irwin served on Colonial's board of directors from 1947 until his death in 1989. In 1948, the board of directors elected M.R. Irwin to the position of vice-president and general manager. In 1949, M.R. Irwin was elected president of Colonial, a position he held, along with others such as general manager, treasurer, or chief executive officer, until 1976 when the board elected M.R. Irwin's son, William R. Irwin, as president of Colonial. After 1976, the board annually elected M.R. Irwin to serve as chairman of the board and elected William Irwin to serve as president. In 1952, the board of directors had adopted a resolution making the president the active head of the corporation, working under the board instead of under the chairman of the board.

After M.R. Irwin first acquired stock in Colonial, he began to steadily increase his ownership interest in the company. By 1968, M.R. Irwin had a controlling block of stock in Colonial, which he continued to build on over the years. By 1980 and thereafter until his death, M.R. Irwin owned 72% of Colonial.

William Irwin was first elected to Colonial's board of directors in 1969. In 1969, the board elected William Irwin to the position of second vice-president. The following year, the board elected William Irwin as vice-president, a position he held until he was first elected president in 1976. William Irwin first appears as a shareholder of record in 1973, holding approximately 6% of the company's stock. By 1980 and thereafter, William Irwin owned 12% of Colonial.

M.R. Irwin's wife, Mary L. Irwin, was also involved in the corporate life of Colonial. Beginning in 1970, the board annually elected Mary Irwin to serve in the position of secretary or as secretary-treasurer. Mary Irwin continued to serve as secretary at least through October 1987, and otherwise as an

officer of Colonial at least through fiscal year 1991. Mary Irwin was first elected to serve on the board of directors in 1977. The corporate minutes of Colonial reveal that Mary Irwin remained on the board at least until the annual shareholders meeting scheduled for October 1988.[1] It appears that Mary Irwin inherited M.R. Irwin's ownership interest in Colonial after his death.

For many years after its incorporation Colonial was a successful and profitable business and by 1976 had a "strong balance sheet" with working capital of over $300,000 and no long-term debt. However, "the poultry industry [was] a test of survival" and in 1976 Colonial recognized that times were changing. A 1976 corporate analysis of Colonial notes that the number of hatcheries and breeders still in business had been greatly reduced over the years. At one time there were 10,000 hatcheries in the United States. By 1976 there were only about 400. Although still a major contender in the poultry industry, over the years Colonial had been required to reduce the number of facilities and by 1976 had hatcheries and/or breeding facilities in only three states, including the poultry farm at Pleasant Hill, Missouri.

The analysis points out a steady decline in per-capita egg consumption over previous years, the increasing percentage of feed costs to total cost of egg production, the reduction in small farm flock breeders, and the increasing cost of hatching egg and chick transportation (the analysis predicted that gasoline prices could escalate to $1 a gallon). The analysis further notes a decline in the international market as breeders in foreign countries began to develop their own skills in poultry breeding.

In the forthcoming years Colonial planned to increase its share of the static domestic egg industry by increasing sales of the True Lines "Mini" to commercial breeders and back-yard flock owners and by developing a more efficient egg-producing chicken, produce more broiler-type chicks to meet expected increases in broiler-type consumption, and aggressively pursue and develop its overseas market through grandparent stock sales. All-in-all, Colonial planned to remain a dominant force in the poultry business and to continue to increase sales and profits.

Apparently, all did not go as planned. The history of Colonial as reflected in the corporate minute books is sketchy after 1976. As of August 31, 1979, the end of Colonial's fiscal year, the common stock and paid in capital equity accounts totalled $362,116 while retained earnings showed a deficit of <$326,954> for a total shareholder equity of $35,162.

The minutes of a board of directors meeting held on December 12, 1980, reveal that Production Credit Association (PCA) had deferred action on Colonial's annual operating loan request and that Colonial, with the approval of the board, had applied for a $100,-000 loan from the Small Business Administration (SBA). The minutes further state that the SBA required "majority stockholders [to] use their own resources as far as possible for operating capital." The board, composed of four members including all three Irwins, accepted the offer of M.R. Irwin and Mary Irwin to loan $10,000 of their personal savings to Colonial at 13.5% interest, the same interest rate charged by PCA. On December 15, 1980, a promissory note in the amount of $10,000 with interest payable at the rate of 13.5% was executed by Colonial payable on demand to the order of M.R. Irwin or Mary W. Irwin. Colonial was successful in obtaining a loan from the SBA.

Colonial maintained its balance sheet and financial statements on an accrual basis of accounting while the corporation filed its income tax returns on the cash basis of accounting. The common stock and paid in capital account balances remained unchanged from 1980 through 1988. However, the corporate income tax returns and schedules and exhibits submitted to the Court based on tax years 1980 through 1988 show a further decrease in retained earnings as the years progressed. According to the 1988 income tax return, by August 31, 1988, there was a deficit balance of <$569,167> in retained

---

1. The corporate minutes submitted to the Court only extend through a board of directors meeting held on October 23, 1987.

earnings, and a total shareholder equity deficit of <$207,051>. The balance sheet dated August 31, 1988, shows a deficit balance in retained earnings of <$597,594> and a shareholders' equity deficit balance of <$235,478>. These figures are misleading, however. The 1985 corporate income tax return, which contains the earliest financial statement submitted to the Court for the period 1980 through 1988, shows that Colonial owned land valued at $24,408. The August 31, 1988, balance sheet shows that land owned by Colonial was valued on the books at $22,908. This land subsequently sold in 1994 for a total amount of $439,489.84, which is considerably more than its book value. In reality, Colonial had assets worth substantially more than the values attributed to them on its 1988 balance sheet or in previous years.

During the years 1983, 1984, 1985, and 1988, M.R. Irwin and Mary Irwin advanced additional funds to Colonial, which the Irwins and Colonial characterized as shareholder loans. The corporate minute books, extending only through October 23, 1987, do not show that the board of directors approved the loans made in 1983, 1984, and 1985. During 1983, 1984, and 1985 the board of directors was composed of only four members including M.R. Irwin, Mary Irwin, and William Irwin. Colonial executed a promissory note for each loan. The promissory notes provide for varying interest rates on a per annum basis. All the promissory notes, except two, are payable on demand to the order of M.R. Irwin or Mary W. Irwin. The loans made by the Irwins are listed below:

| Date | Loan Amount | Interest Rate | Due on: |
|---|---|---|---|
| 12–6–1983 | 6,000 | 13.5% | Demand |
| 11–9–1983 | 4,000 | 13.5% | Demand |
| 1–23–1984 | 10,000 | 13.5% | Demand |
| 12–20–1984 | 10,000 | 11% | 5–1–1985 |
| 2–11–1985 | 10,000 | 14% | 5–15–1985 |
| 6–15–1988 | 12,000 | 10% | Demand |
| 8–24–1988 | 5,000 | 10% | Demand |
| 11–1–1988 | 40,500 | 10% | Demand |
| 12–21–1988 | 5,000 | 10% | Demand |
| 12–31–1988 | 25,000 | 10% | Demand |
| Total | $127,500 | | |

The money the Irwins loaned to Colonial came from M.R. Irwin's inheritance from his mother's estate. Including the loan made in 1980, M.R. and Mary Irwin loaned Colonial a total of $137,500. The loans from the Irwins appear on the 1988 and 1990 balance sheets and financial statements and the 1985 through 1989 and 1991 corporate income tax returns that were submitted to the Court.

To recap, M.R. and Mary Irwin loaned money to Colonial in 1980 and advanced funds to Colonial in 1983, 1984, 1985, and 1988 that were characterized as loans. Colonial obtained the SBA loan that it applied for in 1980. In his testimony, William Irwin first stated that AgriBank, FCB, a successor to one of Colonial's secured lenders and usual source of the corporation's annual operating loan, refused to loan money to Colonial in 1985, 1986, and possibly 1987. However, William Irwin later testified that AgriBank loaned money to Colonial in 1983, 1984, and 1985. William Irwin was not aware of any other items that a bank or other lending institution turned down Colonial for a loan.

George P. Jackson, Jr., a certified public accountant, testified that from 1980 through 1988 Colonial's financial position weakened and that Colonial "probably" would have been unable to borrow money during that period of time.

Colonial threw in the towel and filed a voluntary bankruptcy petition under Chapter 11 on March 9, 1993. In its schedules, Colonial included, among others, the unsecured nonpriority claim of Mary Irwin in the amount of $135,000 and the unsecured nonpriority claim of Central Cooperatives, Inc. (Central) in the total amount of $95,796.05. Central is a farmer-owned cooperative that had sold feed to Colonial since the 1960's. Colonial's debt limit with Central was $60,000. Ben Griffith, the general manager of Central, testified that when Central received Colonial's 1988 financial statements in early 1990 it became aware of $67,000 in shareholder loans that had been made to Colonial by the Irwins. When Central received Colonial's 1990 financial statements, it became aware that the shareholder loans from the Irwins totalled $135,000, as listed on the financial statements. Central continued to supply grain to Colonial even though it was aware of the shareholder loans and even though Colonial had exceeded its debt limit believing that if Colonial failed it would re-

sult in a definite loss to Central. Central felt that it would be in its best interest to continue to supply grain to Colonial. Central subsequently filed a proof of claim on October 21, 1993, for an unsecured nonpriority claim in the amount of $143,946.38. Included in the total amount is $49,472.75 that Central had transferred from its accounts receivable to its reserve for bad debts. Central stated that the entire indebtedness was incurred from October 1989 through September 1992.

Secured creditors' claims, including the claims of AgriBank in the approximate amount of $219,000, totalled about $253,000. The loan to AgriBank was personally guaranteed by Mary Irwin.

On July 29, 1993, Colonial filed a disclosure statement and a plan of liquidation in which it proposed to sell almost all of its assets to an adjacent landowner for $250,000. With the proceeds, Colonial proposed to satisfy the claims for administrative expenses and the claims of creditors that were secured by mortgages on the property. If any funds remained for distribution, Colonial proposed to satisfy an unsecured priority claim for real estate taxes and the claim of a judgment lien creditor in the amount of $10,000. Nothing would have been distributed to Colonial's unsecured creditors or to its equity security holders.

Central filed an objection to the proposed sale contending that a better price could be obtained for the property by selling it in parts rather than as a whole entity. On September 22, 1993, the Court sustained the objection, denied the sale of the property for the proposed $250,000, and converted the case to a Chapter 7.

The Chapter 7 Trustee subsequently sold Colonial's personal property for $20,135 and sold Colonial's real property piecemeal for $439,489.84, for a total amount of $459,624.84. The Court approved payments to the secured creditors, including the judgment lien creditor, and the unsecured priority claim for real estate taxes in the total amount of $259,-465.45. Available for distribution to satisfy administrative expenses and the claims of unsecured creditors is approximately $200,-000.

On February 4, 1994, Mary Irwin filed a proof of claim for an unsecured nonpriority claim in the amount of $248,374.85, which consisted of the principal amounts of the loans made by the Irwins from 1980 through 1988 plus accrued interest. After the Trustee filed an objection to the proof of claim, the Trustee and Mary Irwin stipulated that the portion of the claim based on the December 15, 1980, promissory note was barred by the statute of limitations. The Trustee withdrew the objection and on March 25, 1994, the Court allowed Mary Irwin's claim in the amount of $224,874.85.

Not including the claim of Mary Irwin and the claim of Central, the remaining claims of unsecured creditors total only $36,342.54. Mary Irwin and Central are Colonial's largest unsecured creditors. The stage was set for the upcoming battle.

On April 1, 1994, Central filed a motion requesting that the Court reconsider and vacate that part of the March 25, 1994, order allowing Mary Irwin's claim in order to give Central time to investigate the circumstances surrounding the Irwins' loans to Colonial and, if appropriate, file its own objection to her claim. On May 11, 1994, the Court granted Central 60 days in which to file an objection to Mary Irwin's claim during which time the Court would hold and not rule on the motion for reconsideration. If Central failed to file an objection, the motion for reconsideration would be overruled.

On July 8, 1994, Central filed a complaint requesting that the Court recharacterize Mary Irwin's claim contending that the advanced funds constituted contributions to capital rather than loans and that the Court should treat her strictly as an equity security holder. In the alternative, Central requests that the Court equitably subordinate Mary Irwin's claim to the claims of all the other creditors. Central argues that M.R. Irwin and Mary Irwin were insiders and that Mary Irwin's claim should be subordinated because of:

The actions and conduct of M.R. Irwin, [Mary Irwin], and those acting on [Mary Irwin's] behalf, including failure to obtain approval of the Board of Directors for the purported loans; allowing interest to ac-

crue on the principal balances of the promissory notes; non-payment of the promissory notes; allowing the claims based upon the promissory notes to remain dormant until after a Chapter 11 reorganization case was converted to Chapter 7; continuing [Colonial's] business for the benefit of insiders and to the detriment of creditors; [and] attempting to dispose of [Colonial's] assets for less than fair market value to eliminate [Mary Irwin's] own personal liabilities.

Central argues that M.R. Irwin and Mary Irwin engaged in further inequitable conduct by advancing the monies to Colonial during a period of time when the corporation was undercapitalized. Central also contends that in some circumstances equitable subordination no longer requires inequitable conduct on the part of the claimant, and even if the Court does not find that Mary Irwin engaged in inequitable conduct, her status as a shareholder and the nature of the claim as one based upon alleged loans made by a shareholder makes her claim one that may be subordinated anyway.

Central argues that the Irwins' conduct in advancing the monies to Colonial initially allowed Colonial to pay down debt to some of its trade creditors, but it harmed the outside creditors because the advances kept Colonial in business which had the net effect of significantly increasing the trade debt by the time the bankruptcy was filed.

Central further requests that all costs be assessed against Mary Irwin.

### DISCUSSION

The main issues before the Court are whether Mary Irwin's claim based on shareholder loans should be recharacterized as a contribution to capital and, if not, whether her claim should be equitably subordinated based either on her inequitable conduct or merely because of her status as a shareholder and the nature of her claim. Although in this case the end result is the same, the· Court will first address whether the claim should be recharacterized.

### 1. *Recharacterization*

■ "To be a creditor in bankruptcy the debtor must owe a debt to the claimant." *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr.N.D.Fla.1990). When the issue of recharacterization is raised, the bankruptcy court must determine whether the claim is an indebtedness or whether it is a proprietary interest. *Id.*

> If it is determined that the claim is a proprietary interest the claim will be subordinated ... as a matter of course since "the essential nature of a capital interest is a fund contributed to meet the obligations of a business and which is to be repaid only after all other obligations have been satisfied."

*Id.* (quoting Herzog and Zweibel, the *Equitable Subordination of Claims in Bankruptcy*, 15 Vand.L.R. 83, 94 (1961)).

In *In re Fett Roofing & Sheet Metal Co., Inc.*, 438 F.Supp. 726, 729–30 (E.D.Va.1977), *aff'd* 605 F.2d 1201 (4th Cir.1979), the district court opined: "Where a director or majority shareholder asserts a claim against his own corporation, a bankruptcy court, sitting as a court of equity, will disregard the outward appearances of the transaction and determine its actual character and effect."

■ The Court's independent research has revealed that courts apply several factors when determining whether a claim should be characterized as a loan or as a contribution to capital. *See In re Hyperion Enter., Inc.*, 158 B.R. 555, 561 (D.R.I.1993); *Diasonics*, 121 B.R. at 631; Jules S. Cohen, *Shareholder Advances: Capital or Loans?*, 52 Am.Bankr. L.J. 259, 264–65 (1978) [hereinafter Shareholder Advances].

> Most of the criteria have to do with whether the transaction bears the earmarks of an arm's-length bargain. These criteria include the intent of the parties, whether there was an agreement for repayment, provision for interest, a fixed maturity date, a note or other document evidencing the debt, entries of a loan on the parties' books, lack of subordination to other debts, actual partial repayment, restriction on right to enforce collection, use of proceeds to acquire capital assets, loans

proportionate to stockholdings, repayment to be made only from earnings, availability of outside financing, and enforcement of collection after default. The more the loans bear these earmarks of an arm's-length transaction, the more likely the courts are to treat the loans as loans and not capital investments.

Shareholder Advances, 52 Am.Bankr.L.J. at 264. Also relevant is whether the corporation was undercapitalized. *Id.* at 265. *See also Diasonics*, 121 B.R. at 631 (applying the same criteria used to determine undercapitalization for equitable subordination purposes: " '[s]hareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial undercapitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit.' ").

■ Additional factors include the time when the shareholder advances were made, the amount or degree of shareholder control, and whether the ultimate financial failure was caused by undercapitalization. *Hyperion*, 158 B.R. at 561; Shareholder Advances, 52 Am.Bankr.L.J. at 271–72.

"[N]o one fact will result in the determination that putative loans are actually contributions to capital." *Fett Roofing*, 438 F.Supp. at 731.

■ After weighing the factors as they apply to the circumstances herein, the Court finds that the advances of funds from M.R. and Mary Irwin to Colonial were indeed loans. The Irwins advanced the funds at a time when Colonial had been in business for 40 years. All of the advances were evidenced by promissory notes that provided for interest ranging from 10% to 14% per annum. The promissory notes were payable on demand with the exception of two notes. Colonial listed the advances as shareholder loans in its financial statements and on its income tax returns. No payments were made on the promissory notes, but the advanced funds were not subordinated to Colonial's other debt, there was no requirement that the funds be repaid only from earnings, and there were no restrictions on the right to enforce collection. There is no evidence that Colonial used the advances to acquire capital assets; Central appears to concede that Colonial used the funds to pay trade debts.

M.R. and Mary Irwin did not enforce collection when Colonial defaulted on the promissory notes due May 1, 1985, and May 15, 1985, however, the Irwins had ten years from default to file an action. *See Mark Twain Bank, N.A. v. Platzelman*, 740 S.W.2d 388, 390 (Mo.App.1987); Mo.Ann.Stat. § 516.110(1) (Vernon 1952). The Court finds it is noteworthy that M.R. or Mary Irwin did not seek to collect on all the promissory notes, then upon Colonial's default file suit to obtain judgment lien creditor status, which would have elevated Mary Irwin's claim above those of the unsecured creditors.

M.R. Irwin owned 72% of the stock in Colonial at the time the loans were made and, therefore, did have shareholder control. The earliest financial information submitted to the Court for the years 1980 to 1988 that includes a balance sheet is found in Colonial's 1985 income tax return. At that time, Colonial had issued 28,819 shares of common stock at a par value of $10 per share for total common stock of $288,190. That figure remained the same through 1988. 72% of $288,190 is $207,496.80. The loans made by M.R. and Mary Irwin amount to only 66.27% of M.R. Irwin's capital investment. M.R. Irwin had much more of the Irwins' personal funds invested in capital stock than had been loaned to Colonial.

■ The adequacy of capital contributions is a factor for the Court to weigh. Colonial was not initially undercapitalized and certainly for 40 years the capital contributions were adequate. From 1980 through 1988 the common stock and paid in capital account balances remained constant at $362,116. According to Colonial's balance sheet dated August 31, 1988, the stockholders' equity showed a deficit balance of <$235,478>. However, land owned by Colonial was only valued at $22,908. This land subsequently sold in 1994 for $439,489.84. At the time the Irwins advanced the funds to Colonial, Colonial had assets worth substantially more than shown on its balance sheet. The Court finds that the financial information provided to the Court for 1980 through 1988 does not accu-

rately reflect Colonial's actual shareholder equity during that time period.

There was no evidence that Colonial would not have been able to obtain loans from a disinterested lender when M.R. and Mary Irwin advanced the funds to Colonial. The only year that could be called into question is 1985, based upon William Irwin's initial and subsequent testimony, however Central failed to clear up William Irwin's testimony on this point and the Court finds that Agri-Bank did loan money to Colonial in 1985.

The Court finds that Colonial was not undercapitalized when the Irwins made the loans. Even if Colonial was undercapitalized, there was no evidence that undercapitalization caused the corporation's ultimate financial failure. The evidence shows that Colonial recognized in 1976 that times were changing and tried to adapt for future trends in the hatchery and poultry business, but was apparently unable to do so, which led to its ultimate failure.

Weighing the factors, the Court finds that the funds advanced by M.R. and Mary Irwin to Colonial were loans. The Court will not recharacterize the loans as capital contributions.

### 2. *Equitable subordination*

Section 510(c)(1) of the Bankruptcy Code states that "under principles of equitable subordination, [the court may] subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." The question of whether a claim should be subordinated to payment of other creditors must be made on a case-by-case basis. *In re Black Ranches, Inc.*, 362 F.2d 19, 37 (8th Cir.1966), *cert. denied Black v. Brando*, 385 U.S. 990, 87 S.Ct. 596, 17 L.Ed.2d 450 (1966).

The Fifth Circuit Court of Appeals in *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir.1977), set forth three conditions that must be satisfied before a court may exercise the power to equitably subordinate a claim:

(i) The claimant must have engaged in some type of inequitable conduct.

. . . .

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

. . . .

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].

The foregoing factors are applied in the Eighth Circuit. *See, e.g., In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1282 (8th Cir. 1988).

Here, Central as the proponent of equitable subordination has the burden of proving that each of the elements has been met. *See In re Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir.1991). Further, "[s]atisfaction of the three-prong test does not mean that a court is *required* to equitably subordinate a claim, but merely means that a court is *permitted* to take such action." *Id.* at 1464 n. 9 (emphasis in original).

To satisfy the first element, Mary Irwin must have engaged in some type of inequitable conduct. The inequitable conduct need not be specifically related to the creditor's claim, but it may arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and makes it inequitable for the creditor to share equally in the distribution of the estate. *In re Kansas City Journal–Post Co.*, 144 F.2d 791, 804 (8th Cir.1944). Further, "[a] claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *Fabricators*, 926 F.2d at 1465. Here, Mary Irwin qualifies as an insider, which subjects her claim to this Court's rigorous scrutiny. *See* 11 U.S.C. §§ 101(31)(B), 101(45). When the claimant is an insider of the debtor, the proponent of equitable subordination need prove only that the claimant breached a fiduciary duty or engaged in conduct that is somehow unfair. *Bellanca Aircraft*, 850 F.2d at 1282.

Central has set forth several alleged instances of inequitable conduct engaged in by M.R. Irwin, Mary Irwin, or those acting on

Mary Irwin's behalf. The Court will examine each allegation in turn.

### a. *Undercapitalization*

■ The Court has already addressed the issue of undercapitalization in the context of recharacterization and has determined that Colonial was not undercapitalized during the relevant time period, but it would be appropriate to discuss the issue again here. Central asserts that M.R. and Mary Irwin advanced funds to Colonial at a time when the corporation was undercapitalized, therefore, Mary Irwin's claim must be considered as based upon a contribution to capital rather than based on loans and consequently subordinated on equitable grounds. In the context of equitable subordination, "the issue is not whether the advances 'actually' were loans, but whether equity requires that they be regarded as if they were something else." *Mobile Steel,* 563 F.2d at 702.

■ "The concept of undercapitalization normally refers to the insufficiency of the capital contributions made to a corporation." *Fabricators,* 926 F.2d at 1469. Undercapitalization may be evidence of inequitable conduct that may provide a basis for equitably subordinating a shareholder's claim based upon loans made to the corporation. *In re Antoine's Indus., Inc.,* 49 B.R. 82, 84 (Bankr. W.D.Mo.1984). In *Antoine's,* the Honorable Dennis J. Stewart opined:

It has been said that the amount of capitalization which is adequate is

"what reasonably prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time [of] incorporation of the now defunct enterprise."

*Matter of Mobile Steel Co.,* 563 F.2d 692, 703 (5th Cir.1977), quoting from N. Lattin, The Law of Corporations sections 15, 17 (1971). Further, it is said that

"(1) Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized;

"(2) Capitalization is inadequate if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source. [*Id.*]"

*Id.* at 84. " 'Capital in this context refers not to working capital, but to the amount of the stockholder's investment, the paid-in capital.' " *In re Multiponics, Inc.,* 622 F.2d 709, 717 n. 8 (5th Cir.1980) (quoting Herzog & Zweibel, *The Equitable Subordination of Claims in Bankruptcy,* 15 Vand.L.R. 83, 95 (1961)).

In *Multiponics* the Fifth Circuit Court of Appeals stated:

The time frame for an analysis of the extent of capitalization may vary. Generally we look to initial capitalization, asking whether a company was adequately capitalized at the time of its organization.... Subsequent capitalization may also be relevant to our inquiry, however, in at least two respects. First, evidence of inadequate subsequent capitalization may be indicative of initial undercapitalization. While we do not condone an approach of hindsight in capitalization cases, a view of the later time frames may shed light on earlier ones. Second, proof of subsequent undercapitalization may be further proof of inequitable conduct, such as actions of gross mismanagement, self interest, and the like, and, if the information is analyzed with care, may shed light upon the economic reality of financial commitments to a company.

*Multiponics,* 622 F.2d at 717–18.

The concept of undercapitalization has never been rigorously defined. Absolute measures of capital inadequacy, such as the amount of stockholder equity or other figures and ratios drawn from the cold pages of the corporation's balance sheets and financial statements, are of little utility, for the significance of this data depends in large part upon the nature of the busi-

ness and other circumstances. Nor is the fact of eventual failure an appropriate test. *Mobile Steel,* 563 F.2d at 702–03.

■ "In examining fiduciary claims in bankruptcy, the question of the burden of proof ... may be critical." *Multiponics,* 622 F.2d at 714. The party objecting to the claim has the burden to come forward with enough evidence to substantiate the contention of undercapitalization. *Id.* When the objecting party meets this burden, the burden of proving fairness then shifts to the fiduciary. *Id.* "This proof allocation provides a proper balance of burdens, assuring that the [objecting party] does not underprove his objections while, at the same time, assuring that the fiduciary need not overprove his good faith and fairness at the mere cry of inequity." *Id.*

■ It is important to remember that undercapitalization alone is an insufficient reason to equitably subordinate a claim, but evidence of other inequitable conduct may justify subordination. *Fabricators,* 926 F.2d at 1469. In *In re Octagon Roofing,* 141 B.R. 968, 984 (Bankr.N.D.Ill.1992), *aff'd* 157 B.R. 852 (N.D.Ill.1993), the bankruptcy court stated:

> "It is only when undercapitalization is combined with inequitable conduct, such as fraud, spoliation, mismanagement, or faithless stewardship, that the claims of dominant or controlling shareholders and other insiders will be subordinated." *In re N & D Properties, Inc.,* 54 B.R. 590, 601 (N.D.Ga.1985). "Any other [analysis] would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a foundering company." *Id.*

"[T]here is no general rule that debts based on a shareholder loan will be subordinated in bankruptcy so long as the claimant did not act fraudulently or take unfair advantage of the creditors." *In re Franview Drug Corp.,* 91 B.R. 61, 63 (Bankr.E.D.Mo.1988). *See also Barlow v. Budge,* 127 F.2d 440, 443 (8th Cir.1942), *cert. denied* 317 U.S. 647, 63 S.Ct. 42, 87 L.Ed. 521 (1942) (Eighth Circuit affirmed the lower court's decision to not equitably subordinate a claim by a shareholder based on loans to the corporation stating "[i]t is not our understanding ... that a mere mistake of judgment in continuing a business which is in financial difficulties is in any respect akin to fraud or unfairness."); *In re De Feo Fruit Co., Inc.,* 24 B.R. 220, 227 (Bankr.W.D.Mo.1982) ("To hold that the debt [created by a shareholder loan] may be subordinated on that basis alone would discourage owners from trying to salvage a business and require all contributions to be made in the form of equity capital. We do not think that is desirable as social policy."); *In re Rego Crescent Corp.,* 23 B.R. 958, 964 (Bankr.E.D.N.Y.1982) (Court refused to equitably subordinate a shareholder's claim based on loans made to the company opining "[t]he penalty for attempting to save the corporation should not be subordination.").

■ Here, as previously determined with respect to the issue of recharacterization, Central has not presented evidence that Colonial was initially undercapitalized or undercapitalized when M.R. and Mary Irwin made the loans to the corporation. Even if Colonial was undercapitalized, Central presented no evidence that the Irwins acted fraudulently or unfairly with respect to the loan transactions. The Court finds that the Irwins made the loans in good faith and the Irwins did nothing more than attempt to save Colonial from failing. Undercapitalization does not provide a basis for equitably subordinating Mary Irwin's claim.

#### b. *Failure to obtain approval of the board of directors for the loans*

■ Central contends the Irwins acted inequitably by failing to obtain approval from the board of directors before loaning the funds to Colonial. During the period of time in which M.R. and Mary Irwin loaned the money to Colonial, the board of directors was composed of four members, which included M.R. Irwin, Mary Irwin, and William Irwin. M.R. Irwin owned 72% of Colonial and William Irwin owned 12% of the corporation.

"[T]he courts have universally held that a substantial degree of informality is permissible in the context of the operation of a small,

closely held corporation, and informality of little consequence." *Connors v. Peles,* 724 F.Supp. 1538, 1566 (W.D.Pa.1989). The Eighth Circuit Court of Appeals opined in *Barlow:*

> As a practical matter, it is difficult to see in what way the informal manner in which the corporate affairs were handled prejudiced the rights of creditors. There is no claim that any creditor was deceived as to the nature of the bankrupt's business, as to who was in charge of its affairs, or as to its financial condition. The books of account were properly kept and reflected the assets and liabilities of the bankrupt.... All that Budge and Rose did directly and informally, they could have done indirectly and formally. Whatever was done by the bankrupt in borrowing money from Budge was apparently known to and approved or fully acquiesced in by all of the three stockholders. The evidence does not justify an inference that Budge manipulated the affairs of the corporation for his own personal advantage. The inference which is justified by the evidence is that the advances which Budge made were made in good faith to enable the bankrupt to meet pressing obligations and to remain in business. The advances were made before the creditors, to whose claims it is now contended Budge's claim should be subordinated, had become creditors.

*Barlow,* 127 F.2d at 443.

Here, Central has failed to show that the informal manner in which the Irwins loaned the money to Colonial prejudiced its rights. Central had supplied feed to Colonial since the 1960's. Central was fully aware of the nature of Colonial's business and knew who was in charge. The loans from M.R. and Mary Irwin to Colonial were shown on Colonial's financial statements and Central became aware in early 1990 of the loans. Central's proof of claim states that the debt was incurred from October 1989 through September 1992. Central continued to advance credit to Colonial even after it became aware of the loans in early 1990. Colonial had a debt limit of $60,000 with Central, however, when the corporation surpassed that limit Central continued to supply feed to the com-

pany on credit. Central transferred on its books $48,150.33 from Colonial's account receivable to its reserve for bad debts, yet continued to extend credit to the company. Central's large claim against Colonial was the result of its own mistake in business judgment in continuing to extend credit to the company, and was not caused by the informal manner in which the loans were made. The failure of Colonial's board of directors to approve the loans was not inequitable conduct and will not support equitable subordination.

### c. *Allowing interest to accrue on the principal balance of the promissory notes*

■ Central contends that by allowing interest to accrue on the principal balance of the promissory notes Mary Irwin has engaged in inequitable conduct. The loans bear the earmarks of an arm's-length transaction, including the provisions for interest. The promissory notes were contracts. The Court finds that Mary Irwin has not engaged in inequitable conduct by enforcing the term in each contract that provides for interest to be paid on the principal balance of the loan. This allegation does not support equitable subordination.

### d. *Non-payment of the promissory notes*

■ Central asserts that inequitable conduct has been shown by Colonial's failure to pay the promissory notes. As an on-going enterprise, Colonial was unable to pay its creditors, including Mary Irwin, which initiated the bankruptcy. The inability of Colonial to pay its debts is not inequitable conduct, and the failure to pay the promissory notes is not a basis for equitably subordinating Mary Irwin's claim.

### e. *Mary Irwin's filing a proof of claim after the case was converted from a Chapter 11 to a Chapter 7*

■ Central contends that Mary Irwin engaged in inequitable conduct by allowing her claim to remain dormant until after the Chapter 11 case was converted to a Chapter 7. Because Colonial had scheduled Mary Irwin's claim in the Chapter 11, it was not necessary for her to file a claim prior to

conversion. Fed.R.Bankr.P. 1019(3); 3002(a), (c); and 3003(b)(1). Mary Irwin's claim was deemed filed for Chapter 11 purposes. However, once the case was converted to a Chapter 7, Mary Irwin was required to file a proof of claim in the Chapter 7 case in order to share in the distribution of the estate. 2 Norton Bankruptcy Law and Practice 2d, § 41:3 (1994). Mary Irwin did not engage in inequitable conduct by filing a proof of claim in the Chapter 7 case. This allegation will not support equitable subordination.

f. *M.R. Irwin, Mary Irwin, and William Irwin continued Colonial's business for the benefit of insiders and to the detriment of creditors*

■ Central alleges that M.R. Irwin, Mary Irwin, and William Irwin continued Colonial's business for the benefit of insiders and to the detriment of creditors. The evidence presented by Colonial does not support this allegation. The evidence supports the Court's previous finding that the Irwins loaned money to Colonial in a good faith effort to save the corporation and that Mary Irwin did not engage in inequitable conduct by so doing. This allegation does not support equitable subordination.

g. *The attempt by Colonial to dispose of its assets for less than fair market value to eliminate Mary Irwin's own personal liabilities*

■ Mary Irwin had personally guaranteed the secured debt to AgriBank, which was approximately $219,000 when the bankruptcy was filed. On July 29, 1993, Colonial filed a disclosure statement and a plan of liquidation in which it proposed to sell almost all of its assets to an adjacent landowner for $250,000. AgriBank's debt would have been satisfied from the sale proceeds. Central objected to this proposed disposition of Colonial's assets, the case was converted to a Chapter 7, and the Trustee was able to sell the assets piecemeal for a total amount of $459,624.84. Central asserts that Colonial proposed to liquidate its assets for $250,000 just to satisfy Mary Irwin's own personal liability on the AgriBank loan, which

amounts to inequitable conduct. Central presented no proof to support this allegation. The mere sale of the assets for over $450,000, without more, will not support speculation on the part of the Court that Mary Irwin or someone acting on her behalf engineered the proposed disposition just to satisfy her personal guarantee. This allegation will not support equitable subordination.

■ Central has failed to show that Mary Irwin, or someone acting on her behalf, engaged in inequitable conduct. The failure to prove inequitable conduct defeats Central's attempt to equitably subordinate Mary Irwin's claim. Central argues that not all courts require a showing of inequitable conduct before a claim will be equitably subordinated. Relying on *In re Stirling Homex Corp.*, 579 F.2d 206 (2d Cir.1978), *cert. denied Jezarian v. Raichle*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979), Central contends that this Court should equitably subordinate Mary Irwin's claim because of her status as a shareholder, because the nature of her claim is one based on shareholder loans, and that as between shareholders and creditors the shareholders should bear the risk of loss.

■ Central correctly asserts that not all courts require inequitable conduct on the part of the claimant before applying equitable subordination. *See In re Virtual Network Serv. Corp.*, 902 F.2d 1246, 1249–50 (7th Cir.1990); *Stirling Homex*, 579 F.2d at 214–15. In a Chapter 11 case the Eighth Circuit Court of Appeals has allowed the subordination of a claim for a nonpecuniary tax penalty out of fairness to the other creditors, rather than looking for inequitable conduct on the part of the Internal Revenue Service. *Schultz Broadway Inn v. United States*, 912 F.2d 230, 231–33 (8th Cir.1990). However, with the exception for tax penalties set forth in *Schultz*, when applying the doctrine of equitable subordination the Eighth Circuit Court of Appeals requires fraudulent or inequitable activity on the part of the claimant. *See, e.g., Bellanca*, 850 F.2d at 1282; *Wegner v. Grunewaldt*, 821 F.2d 1317, 1323 (8th Cir. 1987). No tax penalty is involved here and the Court must find inequitable conduct on

Mary Irwin's part before equitably subordinating her claim.

Further, the Court finds that Mary Irwin's claim "is [not] of a status susceptible to subordination" in the absence of inequitable conduct. *See De Feo Fruit,* 24 B.R. at 226. The Court disagrees with the assertion that a claimant's status as a shareholder with an unsecured claim based on shareholder loans is enough to equitably subordinate the claim to a level below that of other unsecured creditors.

The Court concludes that Mary Irwin's allowed claim in the amount of $224,874.85 cannot be equitably subordinated to the claims of the other general unsecured creditors.

### CONCLUSION

Based on the above discussion, the complaint filed by Central Cooperatives, Inc. to recharacterize or in the alternative equitably subordinate the claim of Mary W. Irwin is DENIED. Each party is responsible for its own costs.

The foregoing Memorandum Order constitutes Findings of Fact and Conclusions of Law as required by Fed.R.Bankr.P. 7052.

So ORDERED.